Good morning, Your Honors. My name is Jeff Hansen. I represent Marcus Whitfield in this case, and understanding that I have to keep my own time, I'll try and reserve a few minutes for a rebuttal if I can. Your Honor, I start my argument to you with the general proposition that parole and probation searches vest in the power of police immense power, not only to be able to search an individual parolee or probationer, his person, but also his residence and, if he or she happens to live in a residence with other individuals, that house as well. And I think because of that immense power, this Court's jurisprudence with respect to probation and parole searches suggests that we should be awfully certain that the house we are searching or the residence we are searching actually is the residence where the probationer lives. And I think that's always the issue. How can we be certain, Judge Ferris, that this is the place? And you know, it was certain. I thought it was reasonable probability. Absolutely. And, Judge Wallace, it is reasonable probability, a heightened reasonable probability in terms of what the language is that was used in the Motley case. What case do you rely on that it's something other than reasonable probability, reasonable cause? I may have just misspoken in that regard if I suggested otherwise. It's probable cause. And that's this Court originally, as Your Honors know, had some uncertainty about the nature of the language used, and it evolved eventually into the Motley decision, the en banc case, in which we said you said it was probable cause. And would you agree that a person can live in more than one place? And that is a very difficult issue. And, again, I hate to be semantic. Are you saying yes, no? And I hate to sound semantic, but when you say live, I think that there's a problem with that, Your Honor, when you say live. This Court struggled with it in a couple of cases in terms of one of them cited in the brief, Perez v. Simmons, which is what constitutes a residence. There was a suggestion below, and I know one of the things that is a concern here is can an individual live in two places at the same time? Part of that would be a factual inquiry, of course, whether or not parole rules allowed somebody to live in two places, whether or not a particular search clause would allow two places to be searched. And I would think it would have some relevance to this case, Your Honor. If you looked at a parole record or a probation record, and at the top it said defendant's residence is 123 Main Street and 627 Jones Street. And then you might have a police officer saying, geez, it looks like this fellow lives at two places, and we should be allowed to search both. Essentially what you had here, you had a felony probation record with the Sunnyvale residence, and then you have the parole record where he's given the Drake residence. And so unlike some of the other cases where they were going to unreported residence, he had listed two of them, correct? Correct. So that was his doing, not the State, the government, or the probation people. Certainly the argument that was made by Chief Judge Walker below. Here's the problem with that, Your Honor, and I think it's a very important one. When you have two different records that indicate that an individual may live at one of two places, Your Honors have to make a decision on what signal then to send to the police. Either you say, it looks like he or she might be living in two places, so you can go search both. Or you say, I think we have a problem here. I think that one of these might be incorrect, and we had better do some investigation to determine that we're not going to search the wrong place. Hasn't the law enforcement sort of obviated that problem by committing the person that if they move, they have to change their address on the official record? And if he did, in fact, move to the Drake address, wasn't he responsible to go back to the probation department and so indicate? There is in the record, Judge Wallace, an indication that that was a requirement he had for probation. It also applied to the parole obligations he was under. So we had an individual who was under obligations to report a change in address. That didn't happen here. So if it didn't happen, isn't the inference that he's living at both? No. And that's as I'm saying is that you have two reports, and the police didn't know at that point, A, you can assume that they knew that he probably reported these. Let me just make sure I got the facts right, because you have the two records, but here you also have the girlfriend who says, who makes this report. I mean, this is what kind of kicks off the whole firestorm to begin with. This girlfriend makes a report, and she said sometimes he lives here and sometimes he lives there. That's consistent then with the records. You have a witness plus the records. And I disagree in part because of the state of the record that's before you, Your Honor.  We did not have an evidentiary hearing here. And the affidavit that we submitted on behalf of the girlfriend, Kavia Daniels, indicated that she said we lived in Marin County and he occasionally stayed with his mother. And so, again, if Your Honor ---- The record, but isn't that what the officers reported? The officers reported something slightly different, suggesting more that he actually lived at his mother's address as well. Her later testimony is different from it, from what the officers claimed that she had told them. And that was never resolved by the defense. Right. But we're looking at the time that they're going to make their judgment. We're not really looking retrospectively at her testimony. If they said and had a reasonable basis that she ---- that he lived at two places and then they have two addresses, why wouldn't it be reasonable? Again, it's so important, and this is so important, Your Honor, because I think if the court is headed down what I think is a very dangerous path, to be quite candid, which is to say that when you have conflicting records, you can search both, then we have essentially the ability of police officers to use whatever official records, and we don't really know what that definition might be. In this case, it's evidence. You're not slipping down a slope because our test is reasonableness, isn't it? It is, which would normally then require, Your Honor, a totality of the circumstances analysed. So you see, you haven't slipped anywhere because under each circumstance, you hear all of the facts and you decide whether the police officer acted reasonable. Exactly. Isn't that what we do? Exactly, Your Honor. And in this case, what we're talking about, I believe the judge is talking about, is a bright-line rule, which is somewhat different, which is if you have two conflicting databases which say these are the two addresses, then it's reasonable, and that's what Your Honor is saying, it's reasonable to assume that the defendant or the probationer or parolee lives at both addresses. Okay. Well, if you – if that was all you had, wouldn't you agree it's a different situation than if you had that information plus the officer's statement of what the girlfriend told them? And now we descend into a fact analysis of this particular case, Your Honor. Right. And I'd like to do that, but if I could just again emphasize that if Your Honors say if official records indicate two addresses, and we are going to allow you to search both on a presumption. You see, we would never say that on this case, even if we could, because that's not this case. Right. Very well. Then if we don't have a bright-line rule, then we look at the facts here. And that's where I would submit to you that the facts are so contradictory. She said, I live – Do you want to save some time? You're welcome to keep going, but I just wanted to point it out to you. I think it's so important that I – because this is the key to the case, I'll finish up on this, Your Honor, which is Ms. Daniels said that they lived in Marin County. They stayed occasionally. The other evidence – and I've gone in great length in my brief to show you that the other evidence that was before the police officers at this time clearly indicated that most of it said he lived in Marin and not in his mother's place. And what was crucial, Judge Ferris, is that the police never once, once investigated this in the 24 hours before they conducted the parole search. No calls to the probation officers, no call to the parole officer, no attempt to get a warrant of any kind, even though they had all the time in the world and, in fact, during the evening had made a telephonic call to a State judge who could have issued a warrant. And so there was no investigation. And I think when you have this kind of conflicting evidence and the danger signal is up that one of these addresses may be wrong, that the Court should say we need to investigate, get a warrant, or do something beyond which was done here. So, Your Honor, on that argument, I will submit it to the Court. All right. Could you clarify something? Good morning. May it please the Court. Sorry. My name is Derek Owens, and I represent the United States. Could you clarify how much time elapsed from the time that they had the discussion with the young lady where she had been beaten or struck or something until the time when the officers went to the house to make the search? I believe it was approximately 36 hours, Your Honor. 32 hours. 36, Your Honor. Okay. Now, when the officers first heard from the lady, the first thing they did is serve her and got a search or a restraining order for her. Is that correct? That's correct, Your Honor. Now, on the restraining order, she lists her address, the Drake Street address. But if I'm not mistaken, the restraining order lists his address also, correct? It lists another address. There are two Drake Avenue addresses. A second Drake address up the street. And there's also a Brussels Avenue address. Also what? A Brussels, Brussels Street or Brussels Avenue. Brussels Street. I'm not sure which. So who put those in? I couldn't tell from the record. Does the record show who wrote in his addresses? I believe that Officer Ortiz filled out the restraining order, the top part of it, which includes the 967 Drake Avenue address and the Brussels Street address. And the form language on that, there's a box that I believe he checked which states he must move out and take his belongings from those residences and stay away from those residences. So it was the officer that put those in? I believe so, Your Honor. Based upon information. So on that document, then we have two residents, the additional Drake residents plus the Brussels Street? Brussels Street? Well, on that document, there are three addresses. Three addresses. There's 967 Drake and the Brussels Street, which is the mother's house of the victim of the domestic violence case. Yes. And then the proof of service aspect, which is filled out later, it's on the bottom, has the 943 Drake Avenue address. Yes. And those addresses are the document indicates those are the addresses of the defendant. The top portion that says 967 Drake Avenue that instructs him to stay away from that address does not say that that is the defendant's address. It instructs him to stay away from that address and move out of that address. It instructs him to stay away from the Brussels Avenue address and move out of that address as well. Okay. So I was getting a little confused as to how many addresses we have for the defendant, but your response would be that the restraining order just says you have to stay away from these addresses. It doesn't say that the defendant lives there. That's correct, Your Honor. And that's because those supposedly are the girlfriend's addresses? Where she might be. Where she might be. I believe. It doesn't say that that's where she might be, but I believe that's why they listed her mother's address in that restraining order as well. All right. And then so sometime the next day, these same officers went to the defendant's mother's house. Actually, only one of the same officers. One of them. Who responded to domestic battery, saw Mr. Whitfield just down the street on Sunnydale Avenue, near that Sunnydale residence, and that's where he was arrested. And knocks on the door, and his sister, 15-year-old sister, comes and says he's sleeping in that bedroom. Actually, no. Where's the mom? Well, I'm going to do a quick summary of what happened. Why don't you do that? I believe that the district court ruled that the totality of the undisputed circumstances supported probable cause in this case. And he based it on five particular factors. The first one, as we briefly touched on, was that the domestic battery actually occurred there. And that occurred after the police were flagged down by the victim. She said, Mr. Whitfield dragged me out of the house. He struck me, et cetera, et cetera. And that was the day prior to the search. After that, the protection order was put in place. And at that time, the victim stated that Mr. Whitfield lived, or at least stayed, at that residence. And in her declaration, which is different than what the declaration in the officer says slightly, she does say that he stayed there at least two nights per week. And she also said that he lived with her in Marin at the 967 Drake Avenue address. So the district court found that the victim stated that he did stay there at the Sunnydale address and that he kept a gun, actually a machine gun, under the mattress that he slept on in the Sunnydale address. The district court also found that the address, that Sunnydale address, appeared on two out of the three records checks that police had done. They found two addresses right after the domestic battery. And then after he was arrested, they did another check, and they found 1855 Sunnydale on his probation record and also on his criminal history record. And then they went to do the search. The district court also found that the address was not random. It belonged to Whitfield's family. And it was not a transitory address belonging to some friend or an acquaintance. Additionally, as I stated earlier, Whitfield was ultimately arrested just down the street on Sunnydale Avenue, near that residence, just hours before the search. So that's a basic timeline, and those are the factors that the district court took into account in finding that the totality of those undisputed circumstances supported probable cause. Well, I think so if you have the that's the probable cause for the arrest, right? That's the probable cause to believe that Mr. Whitfield actually resided at the Sunnydale address. Okay. So we are back to the question that I discussed with Mr. Hansen, whether you can live or be or reside at more than one address. And when they went there initially, didn't the mother say he doesn't live here? Yes, that's correct. Okay. Right after the domestic battery, they went to the door, and the mother said he does not reside here. He does not reside here. And I think that one point that we pointed out in the brief is that the mother, as well as Mr. Whitfield, are both what Motley describes as less-than-disinterested sources. And that's because the mother actually, according to the victim, she told the police that the mother watched the domestic battery but did nothing to stop it. And when Mr. Whitfield took her cell phone, the victim's cell phone, to prevent her from calling 911, the mother did nothing to stop that. And then Mr. Whitfield, who is the ultimate disinterested source in this case because he knew he was keeping a semi-automatic machine gun under the bed in the residence that he had reported to his probation officer, seriously had an incentive to tell the police that he lived somewhere else. Now, when you went, when the police officers went back the second time and knocked on the door, then his sister was present. Yes, Your Honor. Fifteen-year-old. And that's when she said he lives in that bedroom up there. Or words to that effect. I believe her declaration says he stayed. Slept. Stayed, yes. Slept or stayed. Stayed in that bedroom upstairs. I believe actually both words are used in that declaration by Ms. Colvin. And when we consider whether or not there was probable cause to believe that that was his address, that he was residing at least part-time, do we also consider the conversations that they had with the mother and the conversation they had with the sister? Yes, Your Honor. I believe those conversations should be taken into account. And that's part of the totality of the circumstances, but it's also what Motley refers to as other evidence. Motley requires it to be convincing evidence that the defendant or the suspect actually does not reside at that residence. And I don't think any of those statements rise to the level of convincing evidence that Motley requires to bring it down from the problem. Why wouldn't, though, if you've got – you certainly have conflicting evidence here, and, you know, whether it's in equipoise or somewhere above or below or whatever is uncertain. Given the 30-some hours of elapsed time, why wouldn't it have been reasonable for the officers to make some inquiry of the government officials who are Well, the record doesn't reflect if they did or if they did not contact a parole officer or a probation officer. I imagine if they did, it would be in there. I imagine it would be in there if they did. Right. But in this case, based on the totality of the circumstances, I think we have enough anyway. I mean, that would have definitely – we would have had absolute certainty that he lived there if that would have happened, and that would have been fine. But what we have here, based on the record, is enough to establish a probable cause that Mr. Whitfield actually did reside at that – at that residence. Does – and your record system, does the record – does the record we have before us show, if you made a telephone call, whether you'd get both records of probation and parole? I just don't understand. Obviously, there's a record of his address in the parole file. There's a different address in his probation file. Do you make one phone call and get all of that data, or do you have to make two phone calls? I don't believe the record reflects that. What I do know is that Officer Ortiz, in his declaration, states that he did a computer search for those records, and that's when both came up. And his most recent conviction was the probation sentence, and that address at the Sunnydale residence, that was his most recent conviction address. And what is – what is the timeline between that record, in terms of his providing that address, and this incident? Well, the record reflects that he reported that address, the Sunnydale address, to his probation officer a month before this incident. And the record reflects that he actually – that's when he met with his probation officer, and he confirmed that that was the correct address. And then just five days, I believe, before this incident, he left a telephone voicemail for his probation officer, but never changed his address, which he's required to do, according to the probation officer. And what's the timing on the Drake address? The Drake address, I believe, was updated on April 9th, 2007, according to the record, according to the declaration of the parole officer. He had confronted Mr. Whitfield. He had – Mr. – the parole officer had gone to the 943 Drake Avenue address, one of Mr. Whitfield's older addresses. Mr. Whitfield wasn't there. The parole officer confronted him on that, and according to the declaration, Mr. Whitfield responded, oh, I thought I told you I moved to 967 Drake Avenue. And that was a few weeks before. I believe it was April 9th, 2007. So in terms of the computer record, is the Drake – I see that I'm out of time, Your Honor. You can continue. In terms of the computer record, was the Drake Street address confirmed then closer in time to the incident, or does that only come out with the parole officer's explanation? That only – what I've just stated from the declarations of the parole and the probation officer only comes out in the declaration. What the officers knew at the time was his most recent conviction was connected to the Sunnyvale address. The Sunnyvale address. Okay. Unless there's other questions. Do you – in this case, there was no evidence taken. The district judge made these decisions based upon the paper. There was no live witnesses, correct? That's correct, Your Honor. Was there an objection to holding such a procedure without live witnesses? An objection by the government? No. No. The defendant. The defendant certainly asked for an evidentiary hearing. Beg your pardon? The defendant, Mr. Whitfield, did ask for an evidentiary hearing. So how do we deal with that? You said the district court found this and the district court found that. Ordinarily, findings are determined by an evidentiary hearing. In this case, the district judge has went ahead based upon affidavits. There's an objection that's made. What – how do we handle that? I think there's a very simple way to handle it, and it's that reading the order of the court, which is at the excerpts of record at 25, he identifies the totality of the circumstances in those five factors, and he based those five factors, and I think he did this intentionally, on undisputed facts. And those are the ones that I had mentioned earlier. Well, I suppose really my question is, does the defendant have a right to an evidentiary hearing before the district judge makes a determination of what the facts are? But the facts that he used are undisputed in this case. Beg your pardon? The facts that he used to rule are undisputed in this case. Oh, they're undisputed? The facts that he refers to, that the domestic battery occurred there, that the victim stated that Whitfield lived, or at least, and I'm quoting this, or at least stayed there, and, quote, the address appeared on two out of three searches of his record, and the address was not random, it belonged to Mr. Whitfield's family, and it was not a transitory address belonging to a friend or acquaintance. Well, what about facts of how the officers handled it, what they did? I don't think that has a bearing on whether there was probable cause to believe that he actually lived there. Well, I don't know. There was 36 hours that went by, and without evidence of what occurred during that period of time, it might strike a review in court as strange. And in Motley, the time period in that was well over a month from the time that it was reported and that action actually took place between that address and the officers. Here we have one day. So there is an objection made that we should have live witnesses for cross-examination. How did the district judge handle that objection? On what basis did he deny it? To be honest, I don't know the exact rationale for his denying that. It's an odd thing, because here's what I think the defendant said. He said, if the court is unable to ascertain the legality of the search based on the party's submissions, Mr. Whitfield requests the court to hold an evidentiary hearing. That's a little bit of an unusual demand for an evidentiary hearing. Then they had the suppression hearing, and I didn't see anything in there where the defendant said, I need an evidentiary hearing. And so it seemed that it just, whatever that request meant went into the ether. But maybe you can shed some light on it. I, frankly, I don't think I can shed some light on that. I don't know what happened to the request after that point, but I do know that based on the submissions of the party, the party's, I think that the court could render an opinion that the totality of the circumstances did support probable cause. All right. Thank you. And if there are no further questions, we ask the Court to affirm the judgment of this Court. Thank you. You have some time. I'll give you two minutes. Thank you very much. Just to clear up some of the factual issues, Judge McKeown, you were just talking about, the parole officer actually did conduct a home visit at the Drake address and verified that that's where Mr. Whitfield lived. No such undertaking was ever made by the probation officer. The records that stand before you indicating where my client lived were both of what I argue are absolute equal stature. There's no indication that one was later in time or updated or anything on any of the records that the police officers had. So in that regard, we have two addresses that neither one of which has merit over the other. With respect to whether I waive this issue, it's sort of a standard practice that when we submit the affidavits, a court looks at them and gives you some indication I'm inclined to accept the officer's testimony as opposed to your client's testimony. In that case, we clearly say, well, if you have the tendency to accept one or the other, then I'd like an evidentiary hearing, which is what I suggested at the beginning. It was not my belief that there would be any reference in his final order to any disputed testimony. And that's why I argued in my brief to you that when we got the order and it indicated that to some extent the district court had relied, as Judge Wallace alluded, to some of the statements that had been made by the police officers, that that was error, that the order should have been based solely, and this is what the government should have done. Can you then go back and ask for an evidentiary hearing at that point? No. Once the order is issued and the decision is rendered, then our remedy is an appeal, a final appeal. Well, that's not the only. You see, the difficulty I have is that you're there, and if you think you need an evidentiary hearing, you have to tell the judge. But in effect, you're saying if you think you can do it based on the submissions, it's okay with us. So you're right, Your Honor. If what you say is assuming all of my facts, it's just like summary judgment that Your Honors see all the time. Assuming all of my facts are correct, then I should prevail. And if the judge goes no, I'm now going to rely on my order on something that is different than we were entitled to an evidentiary hearing. I think in terms of the final request or issues here, once again, the disputes were there, but I think that Judge Walker did try, as government counsel argues, to rest this on almost legal propositions and not factual ones. His legal propositions were really that when you have an official record, that you should be entitled as a police officer to search that residence. And I think that that's where this case becomes unusual and very important for purposes of decision. Because even if it's in an official record, if it's contradicted by another equally important official record, then I think that the police officers are under an obligation to do more. And I would add, Judge Wallace, one other matter that you asked about, and I think there's some confusion here. The restraining order did not just say that my client was obligated to stay away from the Drake address. It indicated in a checkbox that he was required to move out of that address. And again, to the extent that there's ambiguity, that suggests that Ms. Daniels had told the officers who secured that restraining order that that's where my client lived. And as you noted, Judge Wallace, at the bottom of that restraining order, there is another address which was the last reported address that my client made to the police, and he was under an obligation at the time of his arrest to give them a correct address. It's a little difficult to know where this information was secured, and I'm not sure there's anything in the record about it. But I do notice that in the description, it says that he threw her to the ground, dragged her out of his apartment. That is what she – that is what the police officer said, Your Honor. And again, that was never made part of the decision by Judge Walker, nor was there any inquiry made as by my client. Well, it would be corroborative evidence, I suppose, that she told the police officers that that was where he lived, because they put in here his apartment. I don't know what to make of this particular order, but it struck me as – And my final argument will be as a result, Your Honor, if there are those ambiguities, because the burden is on the government in a warrantless search to justify it, that any ambiguity should be construed against the government and that we should prevail in that argument. Thank you very much, Your Honor. Thank you. I appreciate the argument from both counsel this morning. The case of United States v. Whitefield is submitted.
judges: Wallace, Farris, McKeown